A. G. Leonard et al., not as Individuals but as Trustees of Central Manufacturing District, Appellees, v. Autocar Sales and Service Company, Appellant.

Gen. No. 43,164.

376

Heard in the third division of this court for the first district at the October term, 1944. Opinion filed March 21, 1945. Released for publication April 10, 1945.

HAYES, SHEHEE & QUIGLEY, of Chicago, for appellant; RAYMOND F. HAYES and J. GLENN SHEHEE, both of Chicago, of counsel.

WINSTON, STRAWN & SHAW, of Chicago, for appellees; HAROLD A. SMITH and EDWARD J. WENDROW, both of Chicago, of counsel.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

On January 7, 1944 A. G. Leonard, F. H. Prince and D. H. Reimers, as trustees of the Central Manufacturing District, filed a complaint in the superior court of Cook county against the Autocar Sales and Service Company, a corporation, alleging that on December 1, 1926 they entered into a lease with the defendant whereby they demised certain property at the intersection of Pershing Road and South Hermitage avenue in Chicago for a period of 20 years; that defendant covenanted to pay an annual rental of $10,700 in equal monthly instalments, unpaid instalments to bear interest at the rate of 7 per cent per annum; that defendant entered into possession and paid the rental due under the lease up to and including the month of March

1943, but refused to pay the rental from April 1, 1943 down to and including January 1, 1944; and that such unpaid rental and interest thereon ·amounted to $9,-536.10, for which plaintiffs asked judgment. ,A copy of the lease is attached· to the complaint as an exhibit. The answer admits the execution of the lease and the refusal to pay the rental for the 10 months for which suit was brought. For its defense defendant alleged that shortly prior to.March 11, 1943 the use of all the property described in the lease was deemed necessary by the secretary of war of the United States of America to be acquired for military purposes; that the secretary of. war of the United States requested the attorney general of the United States to institute proceedings to acquire by condemnation the temporary use of the entire property described in the lease pursuant to the federal statutes in such case made and provided; that the secretary of war requested the condemnation of the land for a term ending June 30, 1943, with the right to extend the term for additional yearly periods thereafter during the existing national emergency at his election; that on or about March 11, 1943 the attorney general caused to be filed in the district court of the United States for the northern district of Illinois, eastern division, a petition for condemnation by the United States against the land and against the plaintiffs and defendant in this cause, in proceedings known as 43 C 270; that upon the filing of the petition for condemnation an order was entered by the district court of the United States on March 11, 1943, condemning and taking by the United States for military and other war purposes, the temporary use of all of the real property described in the lease, together with the improvements thereon and appurtenances thereunto belonging, and it was thereupon ordered by the district court that delivery of immediate possession be made of all of the real estate described in the lease; that subsequently, on May 1, 1943, the United States

and the secretary of war served notice upon the plaintiffs and defendant in this cause that they had determined and thereby elected to extend the term for the use of the property described in the lease for an additional yearly period beginning July 1, 1943 to and including June 30, 1944; and that the condemnation of the use of the property is subject to the right of the secretary of war to extend the term of condemnation for indefinite future additional yearly periods. Further answering, the defendant alleged that under article VI of the indenture of lease, the defendant's use of the premises thereby demised was limited to the storage, sale and service of automobiles and automobile trucks, which is the business in which defendant has been for many years and is still engaged; that the condemnation of the premises on March 11, 1943 rendered them incapable of occupation for any purpose consistent with the lease; that in March 1943 defendant was doing a very substantial business in the storage, sale and service of automobiles and automobile trucks, and required a building in which it could continue such business; that defendant was then obliged to seek and obtain a new building in order to continue its business; that on March 25, 1943 defendant purchased the real estate commonly known as 200 North Talman avenue, Chicago, and paid therefor a consideration of $50,000, and then moved its place of business from the premises described in the lease to the newly purchased premises. Defendant further alleged that by reason of the aforesaid facts, defendant was evicted by paramount right from the entire premises described in the lease; that the relation of landlord and tenant was thereby abrogated and that the lease was terminated by law; that the premises described in the lease were rendered incapable of occupation for any purpose consistent with the lease and that all liability of the defendant to pay rent under the lease to the plaintiffs ceased on March 11, 1943, the date of the order of condemnation.

Plaintiffs interposed a motion to strike the answer on the following grounds: (1) It appears from the answer that the United States of America has not condemned the property for the balance of the term, and the taking of a portion of the term, less than the whole, and for a period which will terminate before the period of the lease terminates, does not terminate the lease and does not relieve defendant from the payment of rent; and (2) The fact that the United States of America has the right to condemn for a longer period than that already taken is not an excuse for the non-payment of the rent. The motion to strike the answer was sustained. Defendant elected to abide by its answer and suffered judgment for $9,536.10, the amount claimed in the complaint. This appeal followed.

Defendant maintains that the effect of the taking by the exercise of the power of eminent domain of an entire parcel of leased property for temporary use for an indefinite period which may fall short of or exceed the remaining term of the lease, and which renders the land incapable of occupation for any purpose consistent with the lease, constitutes a termination of the lease by operation of law; that the effect of the taking by the exercise of the power of eminent domain of an entire parcel of leased property for temporary use for an indefinite period which may fall short of or exceed the remaining term of the lease, and which renders the land incapable of occupation for any purpose consistent with the lease, operates to abate the rent *pro tanto*. Plaintiff replies that where the temporary use of the entire leased property is condemned by the government under its power of eminent domain (as distinguished from a condemnation of the entire fee of the leased property) and possession taken, the tenant is not thereby excused from further performing the covenant in his lease to pay rent; that the taking of the temporary use of the entire leased property by the government is not an eviction of the tenant by title

paramount within the meaning of the rule excusing the tenant from paying rent when he has been evicted by a title paramount. The doctrine of ''commercial frustration'' which has been applied to ordinary contracts is not applicable to a demise of real property, since a lease differs from the ordinary contract because by it the tenant acquires an interest in the land itself. The legal question presented by the affirmative defense may be succinctly stated to be as follows: Where property is leased to a tenant for a term of years and the temporary use thereof is subsequently condemned by the United States for a period shorter than the balance of the term of the lease and possession taken, but with the right on the part of the government to make renewals which may extend beyond the expiration of the tenant's term, is the tenant, because of such fact, thereafter excused from performing his covenant to pay rent? The question has not been decided by any court in this country. Although it is a well known fact that the United States, in the prosecution of this war, has found it necessary to file numerous petitions to condemn the temporary use of property (as distinguished from a condemnation of the fee) under the authority conferred by Title 50, USCA App. § 632, no court whose decisions are reported, has had occasion to directly consider the effect of such condemnation on the tenant's covenant to pay rent. We have studied the cases cited by the respective parties in support of their arguments. The lease was for 20 years from December 1, 1926 to November 30, 1946. The answer avers that shortly prior to November 11, 1943 the use of all the property described in the lease was deemed necessary by the secretary of war and that he requested the use be condemned for a term ending June 30, 1943, with a right to extend the term for additional yearly periods during the existing national emergency; that on March 11, 1943 a petition for condemnation was filed in the federal court and upon the filing of the petition,

an order was entered condemning "the temporary use of all the real estate described in said lease," together with improvements and appurtenances; that it ordered that immediate possession be made of all the real estate described in the lease; that on May 1, 1943 the United States and the secretary of war served notice on the parties that they had elected to extend the term for the use of the property for an additional yearly period beginning July 1, 1943 to June 30, 1944; and that the condemnation of the use of the property is subject to the right of the secretary of war to extend the term for indefinite future additional yearly periods. Under these allegations the interest the government initially acquired might be denominated as a leasehold interest in the property for a definite term ending June 30, 1943, which was extended for a year from that date, with the right in the government to renew from year to year thereafter. *United States v. Certain Parcels of Land in City of Baltimore, Maryland,* 55 F. Supp. 257; *United States v. 5.741 Acres of Land,* 51 F. Supp. 147; *United States v. 16.747 Acres of Land,* 50 F. Supp. 389. It is clear that the government has not acquired any part of the fee and that plaintiffs' reversionary interest in the fee has not been affected by the proceeding. In view of the fact that the government has only acquired a temporary use of the entire leased premises, the question is squarely presented as to whether this fact excuses the tenant from its covenant to pay rent.

Defendant leans heavily on the case of *Corrigan v. City of Chicago,* 144 Ill. 537, where the rule was laid down that when the entire fee of the leased premises is condemned by the State under its power of eminent domain, the relationship of landlord and tenant ceases and the tenant is no longer obligated to pay rent. Defendant argues from this case that when the entire fee is taken the tenant is unable to further occupy the leased premises and that the same is true in the instant

case, since the government by acquiring the temporary use of all the premises, temporarily and possibly for the remainder of the term of the lease, has also wholly prevented defendant from occupying the leased premises. The basis of the decision in the *Corrigan* case was that the relationship of landlord and tenant necessarily terminated when there was a condemnation of the entire fee, because thereafter the landlord had no further title in the property. In the *Corrigan* case the court points out (pages 544 and 545) that when the fee is taken there is an absolute extinguishment of both interests in the property. We agree with plaintiffs that there is nothing in the reasoning in the *Corrigan* case which sustains the position defendant seeks to maintain, and that the underlying basis for the decision in that case is not present here. Where the mere temporary use is condemned by the government, the landlord's fee title is in no way affected. It will also be noted that in the instant case there has not been an absolute extinguishment of the remainder of the tenant's estate. The pleadings show that defendant's estate, between March 11, 1943 and June 30, 1944, has been taken, and it is only a possibility that the entire balance may be taken. However, in our judgment, whether the balance will eventually be taken or not, is entirely immaterial. Defendant refers to other cases in this and other jurisdictions where only a part of the fee of the leased premises is condemned. The cases in this jurisdiction are *Stubbings v. Village of Evanston,* 136 Ill. 37; and *Yellow Cab Co. v. Stafford-Smith Co.,* 320 Ill. 294, where the rule is laid down that the taking of a part of the leased premises by the exercise of the right of eminent domain, leaving a part susceptible to occupation under the lease, does not release the tenant from the payment of any part of the rent, but he is bound for the payment of the rent reserved for the full term without apportionment or abatement for the part taken. In the *Corrigan* case the court said (page 544):

"And when a portion only of the land is taken, and a portion remains, which is susceptible of occupation under the lease, we have held, following what we regard as the weight of authority, that the covenants of the lease are not abrogated, and that the tenant is bound by his covenant to pay full rent according to its terms. *Stubbings v. Village of Evanston,* 136 Ill. 37."

Defendant declares that the rule adopted in this State contains within its own language the reason for the distinction between the cases holding the leases terminated and the cases holding the leases in force, namely, that if the condemnation leaves a part of the premises susceptible of occupation under the lease, the lease is not terminated, and that if on the other hand, the condemnation renders the land incapable of occupation for any purpose consistent with the lease, as in the instant case, the lease is terminated. The Supreme Court was dealing with a situation where only a part of the fee was taken, and it has not ruled what the result would be if the part of the fee remaining is not susceptible to occupation. We agree with plaintiffs that in any event the cases are not authority for the proposition that the taking of a temporary use of leased premises relieves the tenant from its covenant to pay rent. In the *Yellow Cab Co.* case there was a partial taking, quantitatively speaking, and a complete taking, temporally speaking, as to the part so taken. In the instant case there was a complete taking, quantitatively, but only a partial taking, temporally speaking, of the part taken.

There are a few cases in England arising out of the act of the government in taking the temporary possession of leased property during the first world war and this war, squarely ruling on this point, and they have ruled adversely to defendant's contention. A case squarely in point on its facts is *Whitehall Court Limited v. Ettlinger,* [1920] 1 K. B. 680. In that case plaintiffs let to defendant two flats under leases dated

June 3 and November 21, 1915, at specified rentals. In December 1916 the military authorities, acting under the Defence of the Realm Regulations, served a notice stating that the war department required immediate possession of the flats. The tenant, however, objected to giving up possession. On May 17, 1917 the tenant was informed that the requisitioning of the flats must take immediate effect and that possession would be required on May 19. The tenant accordingly vacated. He refused to make any claim for compensation to the Defence of the Realm Losses Commission, claiming he was not liable for rent. He paid the rent up to May 19, 1917, but declined to pay rent thereafter. The military authorities were still in possession when the two leases expired on June 24, 1918. Plaintiffs sued for the balance of the rent due to December 25, 1917. In entering judgment for the plaintiff, the court said (pages 685–687) Earl of Reading:

". . . I have come to the conclusion that there is nothing in the facts and circumstances of this case which would justify me in saying that the tenancy created by the leases had been thereby determined. If I were dealing with a commercial contract, or an agreement between the parties which did not also amount to a demise of premises as in this case, there would be great force in the arguments which were put before me. It was said in the first place that this is a case of eviction by title paramount, and if it were so Mr. Giveen would have made good the first proposition upon which he rested his case. But I am not satisfied that this was an eviction at law. When the tenant moved away from the flats he did so by force of circumstances—that is, by the order of the Government authorities. I do not think however that it could be said that he was evicted by title paramount. In the circumstances there was no eviction of him by the Government and no determination of the estate created by the leases. The tenant, for all he knew, might have

been able to return to the flats after a short absence, on the other hand he might have to remain away a long time as in the present case, even until the end of the term. . . .

"The second point taken by Mr. Giveen was that there had been a determination of the whole tenancy by reason of the requisition of the flats. It seems to me that that depends upon much the same considerations. It is said that, looking at all the circumstances, treating the case as one would an ordinary contract, and applying the general principles which are not in dispute, I ought to hold the whole tenancy to be at an end. But I find the same difficulty with regard to this point as I did with regard to the first point. The judgment of LUSH, J. in *London and Northern Estates Co. v. Schlesinger,* (1) has been cited, where he said: 'It is not correct to speak of this tenancy agreement as a contract and nothing more. A term of years was created by it and vested in the appellant and I can see no reason for saying that because this Order disqualified him from personally residing in the flat it affected the chattel interest which was vested in him by virtue of the agreement.' I think that dictum applies to the present case. I can see no reason why the chattel interest which was vested in the tenant by virtue of the two leases was affected merely because he was personally prevented from residing in the flats. If I were dealing with an ordinary contract I should feel great force in the argument addressed to me by Mr. Giveen, but I can find no authority and no justification for saying that I must apply to the present case the principles laid down in the citations made by Mr. Giveen. The agreements contained in the leases are not only contracts, they also create an estate by demise for a term of years. Therefore, I think that the plaintiffs are entitled to recover their rent."

The foregoing decision was approved by the highest court of England, namely, the House of Lords, in

*Matthey v. Curling,* [1922] 2 A. C. 180, affirming on this point *Curling v. Matthey,* [1920] 3 K. B. 608. In the *Curling* case the defendant claimed that he was relieved of payment of rent on the grounds: (1) he was evicted by title paramount and the lease was thereby determined; and (2) there was a frustration of the purposes for which the lease was granted The trial judge held the defendant liable for the rent, feeling he should follow the decision in the *Ettlinger* case. The case was appealed to the court of appeals and its opinion is reported prior to the opinion of the House of Lords in [1922] 2 A. C. 180, at pages 180–221. The House of Lords affirmed the lower court's ruling and specifically approved the decision in the *Ettlinger* case.

■■ In *Swift v. MacBean,* [1942] 1 K. B. 375, a case arising out of the second world war, plaintiff claimed for rent due May 16, June 16 and July 16, 1941 in respect of certain premises leased under an agreement made on August 30, 1939. The defense interposed was that the agreement was no longer binding on defendants. In rendering judgment for plaintiff Judge BIRKETT held that the case was governed by the earlier decisions, and stated that merely because the premises were furnished was no ground for distinguishing them and in holding that the frustration doctrine did apply to the particular lease before him. The most recent English authority appears to be *Leightons Investment Trust, Limited v. Cricklewood Property & Investment Trust, Limited,* [1943] 1 K. B. 493. This case is not so close on its facts as the other cases in that it did not involve a situation where the actual possession of the leased premises was temporarily taken over by the government. It is of interest in that it definitely settled in England that the doctrine of frustration, sometimes applied to ordinary contracts, has no application to a lease of real property. In rendering judgment for plaintiffs, Judge ASQUITH said (495):

"It is not disputed that the doctrine of frustration has no application to an ordinary lease: *Matthey v. Curling* (1); *London and Northern Estates v. Schlesinger* (2); and *Whitehall Court, Ltd. v. Ettlinger* (4); nor has it any application to a lease of a furnished house, as was decided recently by BIRKETT, J. in *Swift v. MacBean* (5). The ratio decidendi of these decisions is plain. A contract may be frustrated, but a demise is more than a contract. It is a conveyance of an estate in land or a chattel real. It transfers proprietary as well as personal rights. This seems to me just as true of a building lease as of any other kind of lease."

An appeal was taken to the court of appeals, which affirmed the judgment and stated at page 496:

"The doctrine of frustration, which was first clearly enunciated in 1863 in *Taylor v. Caldwell* (1), has been applied to a variety of contracts, but it has never been applied to a demise of real property. Indeed, there is clear authority that it cannot be so applied."

The Illinois decisions have likewise recognized that a lease differs from an ordinary contract in that thereby an interest in the land itself is vested in the tenant. In *People v. Shedd*, 241 Ill. 155, the court said (165):

"A lease for a term of years is a chattel real. It conveys an interest in the land. While it has some of the attributes of personalty it is treated in many respects as real estate."

In Tiffany, Landlord and Tenant, vol. 1, page 159, it is stated:

"The word 'lease' is unfortunately used in different senses. Its primary signification is well given by Blackstone as 'properly a conveyance of any lands or tenements (usually in consideration of rent or other annual recompense) made for life, for years, or at will, but always for a less time than the lessor hath in the

premises.' Other standard textbooks give substantially similar definitions, and that a lease is a conveyance has been frequently stated judicially. . . . In view of the fact that the entrance into contractual obligations by means of 'covenants' ordinarily constitutes a most important part of a transaction involving the creation of the relation of landlord and tenant, it is not surprising that quite frequently the courts have lost sight of the fact that the really essential part of the transaction is a conveyance, and instead regard it as involving the creation of contractual obligations only, frequently speaking of the 'contract of lease'.''

Defendant calls our attention to the Scotch case of *The Tay Salmon Fisheries Company, Ltd. v. Speedie,* [1929] S. C. 593. The fishery company, as the tenant of the Tents Moor Salmon Fishings and other subjects accessory thereto, brought an action in the sheriff court at Perth against Speedie, the landlord, in which the tenant "craved" the court to declare (1) that by lease dated in August 1916, the landlord let to the tenant the fishings and others for the space of nineteen fishing seasons; (2) that in consequence of bye-laws dated September 1925 and 1928, made by the president of the air council under the provisions of the Military Lands Acts as applied by certain air force orders, and of the bombing and firing practice carried on by the Royal Air Force under these bye-laws, the whole subjects leased had been rendered unworkable and entirely unproductive; and (3) that the tenants were entitled to abandon the lease and fishings as from the end of the fishing season 1926. The sheriff-substitute found that after the tenant had entered into possession, the air council made certain bye-laws for gunnery and bombing practice and that by such bye-laws a certain danger zone was constituted; that the fishings extended over the danger zone; that it was provided by the bye-laws that firing would take place on the range as follows: from April to October, inclusive, on Mon-

days, Tuesdays, Thursdays and Fridays from 8:30 a. m. till 6:00 p. m., and from November to March, inclusive, on the same days from 9:30 a. m. to 3:30 p. m.; that it was provided that when firing took place, signals would be given by hoisting red flags and the danger zone during such time would be closed to the public, and that when it was closed no person could enter or remain thereon under penalty of fine. In 1928 the bombing range was extended and as so extended, covered ⅞ of the leased property. The trial court found and declared as "craved" by the tenant. The landlord then appealed to the court of session. The position of the landlord on appeal, among other things, was that it could not be maintained that the interference with the tenant's rights resulting from the bye-laws amounted to total eviction, *rei interitus,* or frustration, entitling them to abandon the lease. The tenant contended on appeal that it was entitled to abandon the lease on any one of several grounds, one being that the interference resulting from the operation of the bye-laws amounted to *rei interitus;* a second ground being that the interference in question amounted to total eviction; and a third for abandonment being that there had been frustration. Separate opinions were written by Lord President CLYDE, Lord SANDS, Lord BLACKBURN and Lord MORISON. Lord President CLYDE was of the opinion that the case was precisely one of complete eviction, but encountered some trouble in applying the principle of *rei interitus.* He observed that the fishery became unworkable and incapable of possession as a fishery. He was of the opinion that the sheriff-substitute reached a sound conclusion. Lord SANDS felt it unnecessary to determine whether the case was one of eviction or of *rei interitus,* although he was disposed to regard it as falling under the latter, but was of the opinion that the appeal should be refused. Lord BLACKBURN concluded that the tenants had suffered a complete eviction, entitling

them to repudiate the lease and to refuse to pay the rent from the end of the fishing season 1926. Lord MORISON agreed that the tenants suffered an eviction and were released from the obligations in their lease. Neither the English decisions or the Scotch decisions are binding on this court. However, England is the original source of our property law and their decisions should be entitled to great respect in a case involving the application of fundamental principles of the common law relating to real property. Since the middle of the sixteenth century, Scotland has followed the Roman or civil law. Encyclopaedia of the Laws of Scotland, vol. 13, pages 74–78. The English authorities are the only ones ruling on the precise question in the instant case. We are of the opinion that the English cases on the subject are applicable to the facts of the case at bar and that they are consistent with the law of Illinois.

As a second point defendant urges that ''the effect of the taking by the exercise of eminent domain on an entire parcel of leased property for temporary use for an indefinite period which may fall short of or exceed the remaining term of the lease and which renders the land incapable of occupation for any purpose consistent with the lease, operates to abate the rent *pro tanto*,'' and relies on *Biddle v. Hussman,* 23 Mo. 597; *Board of Mississippi Levee Com'rs v. Johnson,* 66 Miss. 248, 6 So. 199; *Baltimore v. Latrobe,* 101 Md. 621, 61 Atl. 203; *Kingsland v. Clark,* 24 Mo. 24; *United Cigar Stores Co. v. Norwood,* 124 Misc. 488, 208 N. Y. S. 420; *Gardella v. Hagopian,* 28 N. Y. S. (2d) 250; Nichols on Eminent Domain (2d Ed.), vol. 1, pp. 713–714. These authorities hold that if a part of the fee of the leased premises is condemned under eminent domain proceedings, the rent accruing afterwards is reduced in proportion to the amount taken. These cases do not state the law of this State. Our view is that the defendant does not have the right to have the rent

suspended in whole or *pro tanto* during the period of the taking.

■■ Under the 5th amendment to the Constitution of the United States both plaintiffs and defendant are guaranteed just compensation for the taking of whatever interests they have in the demised premises. As in our opinion the lease has not been terminated, defendant is guaranteed the right to recover the reasonable value of that portion of its leasehold estate which has been appropriated by the government in the pending condemnation proceedings in the federal court. Plaintiffs will have no claim for the reasonable value of the use of the premises against the government, since the government will not have appropriated any interest of plaintiffs in the premises. In the case of *United States v. General Motors Corporation,* 323 U. S. 373, the Supreme Court of the United States points out the elements which affect the market price to be paid for the temporary occupancy of a building in use under a long term lease. At the time the lease was made defendant was charged with notice that the government might condemn the possession of the premises and it chose to take a lease which did not excuse it from the covenant to pay rent upon the contingency of such an event occurring. Being entitled to just compensation, there is no injustice in holding the defendant liable to pay the rent, even though it cannot actually occupy the leased premises.

For the reasons stated, the judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

KILEY and LUPE, JJ., concur.